v. Howard Brown v. Heitotz Good morning, Your Honor. Good morning. May it please the Court, my name is Andrew St. Lawrence and I'm the attorney for Joseph Aiello and the remaining 21 plaintiffs appellants in this matter. The District Court in this case down below ruled only on one single issue, which is the question of statutory standing for a claim brought under 10b-5. And in its analysis, the District Court, in our opinion, simply disregarded the key holdings of the Supreme Court's decision in the Blue Chip Stamps case in 1975 and specifically disregarded the language that extends the definition of purchaser sale and of a purchaser or seller to, quote, the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities. Persons who hold such rights have been recognized as purchasers or sellers of securities, again, going back to quote from the Supreme Court, not because of a judicial conclusion that they were similarly situated to purchasers or sellers, but because the definitional provisions of the 1934 Act themselves grant them such a status. And that's exactly what the plaintiffs in this case were. Each of them were common unit holders in a privately held company, a Brown Investment Company. As common unit... But they didn't have... First of all, they didn't have a put, call, or option. You're arguing that they had some similar contractual right under the Blue Chip. Yes. Yes, Your Honor. I mean, the statute specifically notes those types of transactions. And I think, can you explain to me why the right that your clients had was not just an opportunity to enter into a contractually binding purchase, right? Isn't that what they really had here? No. Well, Your Honor, I understand. The question is whether they would fall into the category of a mere offeree as that is used in Blue Chip. Right. Well, there was no binding agreement. In other words, they could have taken away that preemptive right. They could have amended the... They... You have to take that away. Your client paid no consideration. Ops, puts, and calls all have consideration, right? Those are... I... There was consideration because at the time that they had made their initial investment in Brown Investment Company, they acquired this right to have these preemptive rights. But they could take it away, right? You can see that. If they had amended the operating agreement to have taken it away, right? They didn't have a contract for sale until they exercised the option. Well, that's... Until they served the notice, right? Prior to that, there was no agreement between them and BIC for an actual purchase. They didn't stand as holding it. They weren't... They were an offeree. They weren't... They didn't have a contractual right to buy. They didn't have the right to buy until they exercised the notice, right? Well, they did not have an irrevocable commitment. And BIC was not committed to transfer... So how are they any different than someone who walks into a stockbroker's office and says, I'm thinking about buying X capital, but I haven't decided yet. And then 10 minutes later, they make an offer or they don't make an offer. They're different because before they walked into that stockbroker's office, hypothetically, they have a contractual right to a security... A right to exercise a right. Well, a right to exercise a right is enough under the statute. The right... The first right is not a right to buy. The first right is a right to exercise a right to irrevocably buy. Correct. And that is what the statute... You're saying that's close enough to constitute... Yes. That is, they have a contractual right. They were parties to a contract, which was this operating agreement between them and BIC that had been amended and could have been amended to strip them of their rights. Let me ask you a question. If the contract had said, if we ever offer stock, we'll give you an opportunity to indicate your willingness to buy, would that have been an offer? That's a closer question, but the rights here were specific. They were prorated to their existing interest in BIC. Well, I understand that there's some definition to it, and so that perhaps answers some of the arguments about the indefiniteness of just an offeree. But I'm trying to understand how they get to the position where they've got something to enforce. Because it was sufficiently concrete that it could not be withdrawn other than by lapse of time, which is what happened here. That is what distinguishes them from a mere offeree who does not have a contractual relationship with a company, and to whom that offer could be withdrawn at any time, with or without notice to the potential offeree. I'm sorry. Can I turn for a moment to the alleged fraud involved here? Yes. Yes, Your Honor. Do you have particularized allegations that they knew of the Staples deal at the time this all went down? Yes, Your Honor. And just before I answer the court's question, just to point out that you do not have to reach that, but I will obviously address that here. But the deal fell through twice before. It had fallen through twice before. So why did they know that this time it was going to go through? Well, this analysis really starts with a question about materiality. And materiality in the context of the acquisition or sale of a company is at a different level than materiality in other contexts. And the overall test for materiality is what affects the total mix of information that a reasonable investor would want to consider. And when it comes to what was referred to in the Columbia Securities case as the death of a company, right, its sale, virtually any level of information is going to be material to a reasonable investor. We have been contacted by Staples. They think they may want to buy us, would have been material to a reasonable investor at this stage in the life of this company. And what they said instead is we get interest from time to time from potential buyers or something that made it seem very ordinary. Something that made it seem very ordinary. And then six days after this closes, they take a concrete material step towards closing this acquisition, which is the hiring of East Wind Advisors. What, it was just six days after? Six days, May 7th, 2018. And then within five weeks, June 20, sorry, May 31st, four weeks, they're at the letter of intent stage, and then the deal closes on June 26th. But counsel, isn't it just as likely that your clients felt that BIC was on the verge of bankruptcy and made a prudent decision not to invest more money in it? A company that is on verge of bankruptcy that's going to go into liquidation and have its assets sold at auction, I agree with you, that is not a good time to invest. A company that is about to be acquired by the largest office products company in the United States stands in a different position than a company that's about to go into liquidation. And you claim that the insiders knew that they were about to be acquired by State Bucs? It is highly plausible, in my view, that they knew that this company was about to go into liquidation. Enough to survive summary judgment. Enough to survive summary judgment, and I submit that there may well be a fair question to go to jury trial at the end of the day about what they knew and when. But the allegations in this complaint are sufficiently plausible to survive a motion dismissed under 9B in the future. That's if we find standing, of course. If we find, if the court finds standing, of course. Can I just go back to the standing for a minute? Yes. In Blue Chip, the limitations in Blue Chip were driven by a concern that injuries would be non-quantifiable in this type of situation. So how would you ever quantify damages for your clients in this type of situation? It's the same as any other option, right? They have a contractual right to exercise, to purchase at a specified price, a certain amount of stock. But if they say, if I had known this information, I would have purchased X number of share. They could just say whatever, and they get caught with any number, right? Well, up to their pro rata interest in the company. Right. There's a cap, right? But there's a certain level of speculativeness that is true in any 10b-5 case, because you do not, it is very difficult for the court, you know, in the abstract to understand which a person who purchased securities, right, who unquestionably has standing under 10b-5, how much of that decision to purchase, or how much of the stock that they purchased was influenced by the fraudulent information that they had. Well, that's why, that's why the courts come around with effective market theories and things like that. Exactly. But here, we know what the... One presumes that one's aware of the information that's out there and makes a decision not on one specific representation, but perhaps on others, once materiality... Once the materiality threshold is crossed. ...is taken care of. Exactly. In your position, they'd all be entitled to up to the cap, then? I believe that if they knew what the insiders knew, they would have fully exercised their option to purchase securities under this agreement. That is my thought. You have reserved three minutes, Greg. I have. I have. Thank you, counsel. Sure. Thank you, Your Honor. We'll hear from, well, high touch or ground, go on. Good morning, Your Honors. Adam Offenharts with Gibson Dunn on behalf of the Aramark Defendants. Your Honor, you have all really focused on the critical issue here, which is standing, and you've focused on the critical case here, Blue Chip, and I think that... It was dicta, what they said in Blue Chip, wasn't it? Dicta relating to these kind of contracts? Well, Your Honor, Blue Chip... Well, it didn't... The issue didn't involve these kind of contracts. Well, Your Honor, I think, broadly speaking, the court in Blue Chip did say, and I'm quoting language at U.S. at 751 Note 13, where the Blue Chip court says, in arguing that it, as an offeree of stock, much like the plaintiffs here, ought to be treated as a purchaser or seller for purposes of the act, respondent is, in effect, seeking a judicial reinsertion of language into the act that Congress had before it, but deleted prior to the passage. So as a general rule, I think Blue Chip hits very hard on this very issue. Now, Your Honor, Blue Chip also provides tremendous guidance on how to interpret and read Rule 34. Blue Chip spends a significant amount of time talking about the legislative history, about focusing on the text of the statute, and on the practical policy issues, which Your Honor was addressing, and indeed, this court, as we all know, the Blue Chip court affirmed and adopted the Bernbaum decision of this court, and indeed, this court in the Murtell case in 2004 walked through the legislative analysis, intent, and deep read of Blue Chip and spoke favorably about that. So when I think you do that kind of dive into Blue Chip, it provides tremendous guidance. For instance, the language that my friend across the caption focuses on is but a few words in a general Blue Chip definition. Of course, he focuses, and indeed, we all do as litigators, he focuses on the words that help him. He doesn't focus on the words that don't help him. The language that follows the words he focuses on are that, you know, the Blue Chip court reaches the language because of the definitions at hand in the statute. When you look at the definitions of the 34 Act, it clears the bell, and it reiterates what this court was asking my friend about. Section 13 of the 34 Act, 15 U.S.C. 78C, the terms buy and purchase each include any contract to buy, purchase, or otherwise acquire. It's a contract to buy, not an opportunity to enter into a contract. Exactly. That is what the rule says. And importantly, when the 34 Act came to Congress. That's what makes splits and calls. They're contracts. They're arrangements. With timing provisions, either tied to a date or a time or a market number. Absolutely, Your Honor. I buy 100 calls on IBM, and they expire worthless. I sell them. I buy, you know, I make money. There's a contract. There's evidence of how much I was paying, how much I bought. It's a contract. You pay a premium for those things as well, right? Yes. Yes, Your Honor. How are preemptive contract holders different than option holders? Preemptive contract holders are different because there is no contract to buy or sell securities. What a preemptive right holder has is, well, let me take a step back. What the statute requires, and as we've discussed this morning, is a contract to buy or sell securities. Isn't that what an option is? Yes. And options and puts also, a contract to buy or sell securities. And isn't that what the preemptive contract holders have? Your Honor, respectfully, no, not, because what the preemptive right holders have is a contract that gives them the right to receive an offer to sell or a solicitation from, in this case, BIC, that the offeree can then act on and purchase or not act on. They're very distinct items. The preemptive right gives me, if I'm a preemptive right holder. But how are they different analytically? Aren't they the same analytically, really? Well, Your Honor, I would suggest they're not the same analytically, and they differ for several reasons. From a public policy standpoint, the issues elucidated by the court in Blue Chip are absent in a put, a call, a purchase. I buy 100 shares of XYZ stock, and I claim that I bought those in reliance on positive news, or I sold in reliance on negative news, and the stock price moves, and I sue. The Supreme Court in Blue Chip says, you know, okay, that's a claim. You're a buyer or seller. The Supreme Court in Blue Chip made very clear that it did not want people to sit on the sidelines and say, you know something, I don't know where this stock is going to go. But these people were not on the sidelines. They were holders of a right to purchase new stock when it was offered. They were holders of that right. Why isn't that covered by the very act that we're talking about? Wasn't that the policy choice of Congress to protect even these people? Well, Your Honor, I think that Congress, both in 1944 in enacting the 34 Act, and then in 1957 and again in 1959, the SEC sought amendments to the definition of buy-sell that would have included authorities, that would have included holders of preemptive rights. And Congress rejected that in each of those three instances. Counsel, let me ask you, if BIC decided to issue additional shares and not ask the preemptive rights holders if they would recognize their rights, could they have gotten away with that? Could they not just not follow through with the offer? Well, Your Honor, I think off the top of my head, the preemptive right holders would have an action in contract to, for breach of contract. Why isn't that enough for statutory standing? Because a breach of contract is a broader claim than a Section 10b-5 Rule 10b claim. The Blue Chip Court, the legislative history elucidated in Blue Chip and adopted in the Nortel case in 2004 by this court, makes clear that the goal of the burn-bound rule that the Supreme Court adopted was not to expand endlessly and create a case-by-case analysis of people who could bring security claims, but rather it was to provide a defined, delineated test. And that test, as the Supreme Court in Blue Chip made clear, was first, definitional. You read the definition. The Blue Chip Court also stressed the statutory history. And again, language that would have included preemptive rights was rejected on three separate occasions by Congress. Your Honor, there's no agreement to buy, when BIC issues some stock, there's no agreement for the preemptive right holders to buy in at that moment in time. They have to provide a notice. Yes. So what they're entitled to is notice of the opportunity. Then they have to do something. So all they're benefiting from is the offer to buy. They're still in an offering position. There's no contract between them for purchase. Your Honor, you're absolutely right. The operating agreement makes clear that if BIC issues additional shares, each common member shall first be offered the opportunity to participate. That's in the appendix of 334. I think it can be amended, right, unilaterally. I'm sorry, Your Honor. Could the operating agreement be amended unilaterally to limit those preemptive rights in some fashion? Is that possible or not possible? I guess it could well be amended, but the language that governs the issues here before the Court are very clear. For instance, the operating agreement goes on to explain that only if a common member exercises its preemptive rights does the member irrevocably agree to purchase BIC shares. That's at the appendix A267. The number of shares isn't set by the initial offer to the preemptive class. That's determined once they provide notice, and they say how many they intend to buy. Yes. It'd be a different case had these people exercised those notices and said give me 100 shares, I want 100 shares, and then it had tanked because of a misrepresentation. I mean, that would be a classic, that'd be the classic what we see 10B-5. This is, instead of that, the economic value of it shot up, which makes it a little bit different than the usual 10B-5. It does make it different, but, Your Honor, I— But until there's definition to their contractual right, there's no certainty here.  There's no certainty as to the preemptive right holder's desire to actually exercise and be bound by the exercise of the notice. All there is is an opportunity for them to do it. Yes. Yes, Your Honor. Can I turn, as I did with opposing counsel, to the issue of the alleged fraud? How are we to believe that the deal with Staples, which went through two months after the letters to the holders of these rights came to fruition, how do we supposed to believe that they had no knowledge of this, the insiders? Well, Your Honor, I think the court already suggested what's really going on here is this was the third effort to close a deal with Staples. The first time two companies meet, if they don't know each other and they start negotiating, a deal can happen very quickly. Maybe it can't happen in 30 days, 50 days. We all have corporate colleagues who probably pulled plenty of all-nighters cutting deals that happened incredibly quickly. But when you have a third deal, when the first two deals are broken and the parties go their separate ways, there's already a familiarity with the issues. There's already drafts floating around. There's already been some diligence done. Right, exactly right. But so how do we know that the insiders didn't know that the terrain had changed? Well, the insiders, well, because there's no allegation that plausibly shows that that happened. For instance, there's no allegation that any interactions, any communications, anything happened involving Staples prior to We can infer, as counsel suggests, that since they hired counsel to deal the deal eight days after the letters went out, that there was insider knowledge that this was about to happen. Your Honor, that is an inference, but I don't think that is particularly plausible inference. When you hire an advisor to assist with a deal, you usually have to pay them a significant retainer. You don't hire them until you need them. And they hired them eight days after the letters went out or the period ended. Well, Your Honor, actually, I think it was six days, to make the record very clear. But I do a lot of M&A-related litigation, and it is not uncommon for a bank to get hired on a Sunday because Saturday, someone decided, we got to get this closed. I mean, this is not a situation where banks, and it's not a situation where these people, I mean, to me, the fact that they were hired six days after shows that the talks started again. Now, even when they were hired and the talks started again at some level six days later, at that time, there was still, there's still no reason to believe a deal will close. In fact, plausibly, given that the deal has cratered twice before and that the financial condition of Aramark, of, sorry, of BIC, by all accounts, has worsened, one could imagine that the odds of a deal closing are even less likely when West Angel is hired six days after. So I think that this is fraud by hindsight. I think my friend across the caption is looking at this from, there was a deal 55 days later. Therefore, at a day that is fortuitous for my fraud claims, everyone had to know. Staples was in on it. I mean, why would Staples be in on this fraud? It just, it's a fraud by hindsight, easy, conclusory allegation. Your Honor, I'd also note that the plaintiffs have state law claims. They have fraud claims. They have breach of fiduciary duty claims, good faith and fair dealing claims. We obviously think those claims fail both on the pleadings and on the merits. But this is not a situation where if, because of the rules of U.S. Supreme Court in Blue Chip, and the definitions in the statute and the legislative history from the 34 Act, and the 57 and 58 amendments, and Birnbaum, and Nortel, and the cases, the legion of cases on holders where someone holds stock on day 10. I have 100 shares on day 10 of IBM. And on day 50, something happens, and the class period that's defined is from day 49 to day 500. And during that class period, I'm neither bought nor sold. I don't have a claim. I mean, that's just foreign book securities law. I'm a holder. I didn't buy, I didn't sell, I don't have a claim. In effect, that's what these plaintiffs are. They have stock. Counsel, you told us, you gave us a litany of cases. Can you tell me any binding precedent from this circuit of finding that preemptive right holders do not have statutory standing under 10B? Any case that says that explicitly. Well, Your Honor, I will say that the Sixth Circuit in the Gap case. Yeah, but I asked about this circuit. I apologize, Your Honor. And I started by saying in the Sixth Circuit, and I apologize. Your Honor, I think the closest in this circuit is the Rangzoni case, where this court made clear that when someone has not purchased or bought securities, they have other claims. It's not exactly directly on point, but I do think the Nortel case and other cases in this district, including some district court cases, do address this issue and show great deference to blue chips. In fact, the Nortel case from 2004 shows tremendous deference. So is it fair to say that the answer to my question about binding precedent in this circuit is no? There is none. Your Honor, that is correct, but of course, we think that blue chip is a very instructive, helpful case. Thank you. Thank you, Your Honor. Your time has expired. We'll turn to the attorney for Brown and others. Thank you, Your Honor. I'm Stephen Kaplan, Rosenthal and Kaplan for the Brown parties. And I'm basically ceded to Mr. Ofenhart the opportunity to discuss the standing issue, which is front and center. But I think we obviously join in the argument, the right to be offered an opportunity to purchase shares is not the same as having a contractual right to purchase. And I think under the blue chip standing, it simply does not afford standing under 10B-5 to pursue these claims. So your clients, the Browns, made out very well in this deal, right? Didn't they get some bonuses? They, the Browns- Some direct cash payments? The Browns, who invested a tremendous amount of money into this company, and who did not buy anywhere close, and it's not alleged, did not buy their full allotment of these preferred shares, which they certainly would have done if they knew this was a done deal. But it's not alleged, and it didn't happen. Yes, they were the ones who were running, Howard Brown ran, founded this company, ran this company, and ultimately received some payments not to compete going forward, and received- So there are substantial payments not to compete, right? There are substantial payments, Your Honor. And what would they compete with, anyway? But, well, he was in the office supply business for many years now. It is not likely that this was a very substantive investment going forward for independent companies. So it's a way to pay them off, right? But that's not, that's not, the fact that Howard Brown may have gotten a payment has nothing to do with the claim as to whether or not these preemptive rights were wrongfully withheld. From these defendants. Their claim, and Your Honor touched on it a little bit, is that somehow or other, the, all of the insiders knew that the Staples deal was going to happen. The bottom line here is- Well, Oregon didn't have to know, but Enough had to know. Well, they- So that they could cash in once the deal went through, as we were just discussing, in large payments to both Browns. Yeah, that's right, Judge, but, you know, think about what the situation here was. This was a company which had, which was clearly losing money, barely able to survive, only able to survive with the constant infusion of cash. And the reason that anyone was infusing cash into this company was to allow it to find someone to buy it. They tried twice with Staples. Those deals fell through. They finally did a third deal. It is, which they allege on information and belief, because there is no knowledge that they must have known that a Staples deal was imminent. The preemptive rights offering made clear that BIC was looking for buyers. The plaintiffs certainly knew that BIC was looking for buyers, because this was an insolvent company. It couldn't survive. So the fact that they went back to Staples after they were able to keep the company afloat, the inference that they must have known at the time the offering was made that they were going to sell to Staples is simply not viable. We don't believe could survive on the motion to dismiss, because this type of information and belief pleading without any substantive basis, based solely on the fact of the proximity and time, is under the law is insufficient. Everybody knew. The plaintiffs knew. The Brown people knew. Aramark knew that this company had to be sold. And everybody knew. You never put that in the letter, the offering letter. That it's patently obvious to everyone that this company must be sold to survive. You didn't put that language in the letter. Well, no, but the language in the letter did say that the company would be seeking buyers going forward. So the only issue here is whether they knew that a Staples deal was imminent. And there's no factual allegations which would support that leap. But I give credit to the Browns not to put in writing the deal is dumped right down the road. They were not stupid enough to do that. Well, Judge, if they knew that deal was going forward, and it's not alleged in the complaint that if they knew the deal was going forward, why wouldn't the Browns have bought their maximum share of preferred units? They would have maximized their profits. But the insiders didn't, and it's not alleged. All right. Anyway, thank you. Thank you, Your Honor. Mr. St. Laurent, you have three minutes for rebuttal. Thank you, Your Honor. I'll try to move quickly. So I want to start with where Judge Wesley left off, which is talking about the concreteness of these preemptive rights. And if you look at section 4.3 of the operating agreement, which is page 334 of the appendix, A and B deal with the rights that are held by the unit holders here. And they both clearly say that the common members shall be first offered the opportunity to be subscribed for such issuance of equity securities pro rata in proportion to the number of outstanding common units held by such common member on the same terms and condition proposed to the board, proposed to issue the equity securities. That is concrete. Prior to their exercise of their option, what is the number of shares that they've decided on? What is the definiteness of the obligation with regard to the number of shares they're entitled to? Now, what can they ask for? What is the term that they've asked for? They're not entitled to a share, a number of shares, until they identify that they want to participate and to then name a number of shares, right? Well, if so, for example, the way I read this. If Joseph Aiello, just to start with my nameplate, had owned 5% of BIP, right, that was his interest. He was entitled to purchase 5% of the securities offered. Let me ask you this. I have a contract that says I have a contract to buy 10 shares of Sholowit. I have a contract that says if I wish to, I may buy up to 10 shares of Sholowit. One is definite, the other is not. I think they are. One is definitely a contract to buy. I have a right to buy 10 shares. It's definite. I know what it is. The other is an opportunity. I have the right to buy up to 10 shares of Sholowit. But that's going to exactly my point. That's second type of instrument. Is the second one a buyer under the 34 Act? Yes, because that's a holder of an option. Anyone who has an option has an option to buy up to 10 shares. Anyone who holds an option is a buyer. Is that your view? Yes. Contractual purchaser or seller under the 34 Act. Yes, as the clear terms of blue chip provide. And that's exactly the same point I want to make. That's because the Act specifically references options, which this is not. We should be adding language to the Act that's not there. There's nothing in the Act about this type of situation. This is a judicially created private right of action that the Supreme Court endorsed in 1975. And the Supreme Court included that language, other contractual rights or duties to purchase, which this is. And to go back to the hypothetical that Judge Pooler gave to my learned colleague, well, if they didn't give these preemptive rights, what would happen to the unit holders? And my colleague said, well, there'd be a breach of contract. Well, what would be the measure of damages for that breach of contract? You were deprived of your ability to purchase shares under the agreement. That falls within a contractual right or duty to purchase shares as defined by blue chip. I think I'm over time. Thank you very much. Thank you all for a very lively argument. We'll reserve decisions. Thank you.